In the United States District Court
Eastern District of Arkansas
Western Division

Tyshun Hampton

v.          Case No. 4:19cv235-JM

Love, Beal & Nixon, P.C.
Midland Funding LLC
Midland Credit Management, Inc.          Defendants

**FILED**
Plaintiff U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
APR 08 2019
JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

## Complaint

This case assigned to District Judge _Moody_
and to Magistrate Judge _Ray_

1. Defendants communicated with Tyshun Hampton during the course of debt-collection litigation when they knew he was represented in the debt-collection litigation by his attorney.

2. Defendants Midland Funding LLC and Midland Credit Management, Inc. also reported false credit information to TransUnion and Equifax by reporting that Hampton owed a higher balance and an amount past due in amounts that were more than he actually owed.

### Jurisdiction

3. Jurisdiction of this Court arises under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 15 U.S.C. § 1692k(d).

4. This action arises out of Defendants' violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"), and the Arkansas Fair Debt Collection Practices Act, Ark. Code Ann. § 17-24-501, *et seq.* ("AFDCPA"), in their illegal efforts to collect a consumer debt from Tyshun Hampton.

5.     Venue is proper in this District because the acts and transactions occurred here, Plaintiff resides here, and Defendants transact business here.

6.     Defendants have transacted business within Arkansas by attempting to collect a debt from Tyshun Hampton using the mail and litigation, while he was located within and permanently residing in Arkansas.

## Parties

### *Tyshun Hampton*

7.     Tyshun Hampton is a natural person who currently and permanently resides in North Little Rock, Pulaski County, Arkansas.

8.     Hampton is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3) and Ark. Code Ann. § 17-24-502(2).

### *Love, Beal & Nixon, P.C.*

9.     Love, Beal & Nixon, P.C. (Love, Beal & Nixon) is a professional corporation operating from 6621 N Meridian Avenue, Oklahoma City, OK 73116.

10.    Love, Beal & Nixon is a law firm.

11.    The FDCPA and the AFDCPA applies "to lawyers engaged in litigation[.]"[1]

---

[1] *See Heintz v. Jenkins*, 514 U.S. 291, 115 S. Ct. 1489, 131 L. Ed. 2d 395 (1995).

*Love, Beal & Nixon is a debt collector*

12.   Love, Beal & Nixon is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6) and Ark. Code Ann. § 17-24-502(5)(A).

13.   The term "debt collector" has two prongs:

a.   any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts; or

b.   any person who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. 15 U.S.C. § 1692a(6) and Ark. Code Ann. § 17-24-502(5)(A).

14.   Love, Beal & Nixon uses instrumentalities of interstate commerce or the mails in its business the principal purpose of which is the collection of debts.

15.   Love, Beal & Nixon regularly collects or attempts to collect, directly or indirectly debts owed or due or asserted to be owed to another.

16.   Love, Beal & Nixon's website states that it is "The Leading Law Firm Focusing on Debt Collection & Litigation in Oklahoma."[2]

17.   Love, Beal & Nixon's website allows consumers to make payment on defaulted debt.[3]

---

[2] *See* http://www.lbnlegal.com/index.html [last checked on April 4, 2019].

[3] *See* http://www.lbnlegal.com/paymentOptions.html [last checked April 4, 2019].

18.     Love, Beal & Nixon is a member of the National Creditors Bar Association.[4]

19.     Love, Beal & Nixon is a member of ACA International.[5]

### *Midland Funding LLC*

20.     Midland Funding LLC (Midland Funding), is a foreign limited liability company operating from 2365 Northside Drive, Suite 300, San Diego, CA 92108.

21.     Midland Funding is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6) and Ark. Code Ann. § 17-24-502(5)(A).

22.     Midland Funding uses instrumentalities of interstate commerce of the mails in its business the principal purpose of which is the collection of debts.

23.     Midland Funding purchases defaulted accounts of consumer debt and then attempts to collect these debts via collection letters, telephone calls, and suing consumers in its own name as plaintiff in debt collection lawsuits.

24.     Midland Funding does not originate loans or extend credit to consumers.

25.     Midland Funding purchases defaulted consumer debts for pennies on the dollar, so that it can derive large profits from collection on the consumer debt it purchases.

---

[4] *See* http://www.lbnlegal.com/memberships.html [last checked April 4, 2019].

[5] *Id.*

4

26.   Midland Funding hires Midland Credit Management, Inc., as its "servicer" to collect on its defaulted accounts of consumer debts via collection letters sent by Midland Credit Management, Inc. to consumers.

27.   Midland Funding hires Midland Credit Management, Inc., as its "servicer" to collect on its defaulted accounts of consumer debts via collection phone calls to consumers.

28.   Midland Funding hires Midland Credit Management, Inc., as its "servicer" to retain lawyers and law firms, like Love, Beal & Nixon, who are also debt collectors to collect the debts by filing debt collection lawsuits against consumers.

29.   Midland Funding files debt collection lawsuits in its own name as a plaintiff, so that it can obtain judgments against consumers, become a current creditor in its own name, and then execute on the judgment by wage and account garnishment against consumers.

30.   Midland Funding's debt collection complaints are supported by affidavits of employees of Midland Credit Management, Inc., that state the consumer owes Midland Funding a certain balance on delinquent accounts.

31.   Midland Funding and Midland Credit Management, Inc. are wholly-owned subsidiaries of Encore Capital, a public company, and share common management with Encore Capital (Encore).

32.   Midland Funding and Midland Credit Management, Inc. operate in concert with one another and affiliates, to purchase and collect consumer debt on a massive scale.

33.    Midland Funding and Midland Credit Management, Inc. and their affiliates are one of the largest debt buyers and collectors in the United States.

34.    Defendants Midland Funding and Midland Credit Management, Inc. send collection letters by United States mail, call consumers from call centers in the United States, India, and Costa Rica, furnish consumer information to credit bureaus, and sue consumers in state courts across the country.

35.    Defendants Midland Funding and Midland Credit Management, Inc. purchase or claim to purchase portfolios of old consumer debt from some of the nation's largest consumer finance and telecommunications companies, and from other debt buyers, for pennies on the dollar. These debts primarily consist of charged-off consumer credit card and telecommunications debts, obtained at various points in time after default.

36.    From 2009 to 2015, Encore states in SEC filings that it paid about $4 billions for approximately 60 million consumer accounts with total face value of $128 billion. Encore's SEC filings further state: "During the year ended December 31, 2018, we invested $1,131.9 million to acquire portfolios, primarily charged-off credit card portfolios, with face values aggregating $8.5 billion, for the average purchase price of 13.3% of face value. During the year ended December 31, 2017, we invested $1,058.2 million to acquire portfolios, primarily charged-off credit card portfolios, with face values aggregating $10.1 billion, for an average purchase price of 10.5% of face

value. During the year ended December 31, 2016, we invested $906.7 million to acquire portfolios, primarily charged-off credit card portfolios, with face values aggregating $9.8 billion, for an average purchase price of 9.2% of face value."

37.   About half of Midland Funding and Midland Credit Management, Inc.'s U.S. collection income comes from "legal collections." (Annual report of Encore Capital on SEC form 10-K for year ending December 31, 2015, original page 39; annual report of Encore Capital on SEC Form 10-K for year ending December 31, 2018, original page 32.)

38.   In the year preceding the filing of this civil action, Midland Funding filed over 2,100 debt collection lawsuits in Arkansas courts, and many more across the country.

39.   Upon information and belief, almost all of Midland Funding's resources are devoted to debt collection.

40.   Upon information and belief, almost all of Midland Funding's revenue is derived from debt collection.

41.   Upon information and belief, almost all of Midland Funding's expenses are related to debt collection.

42.   Midland Funding is a licensed "collection agency" with the Arkansas State Board of Collection Agencies.

43.   The term "collection agency" has three prongs:

   a.   any person, partnership, corporation, association, limited liability corporation, or firm, which engages in the collection

7

of delinquent account, bills, or other forms of indebtedness owed or due to be owed or due to another; or

b.   any person, partnership, corporation, association, limited liability corporation, or firm which solicits claims for collection; or

c.   any person, partnership, corporation, association, limited liability corporation, or firm that purchases and attempts to collect delinquent accounts or bills. Ark. Code Ann. § 17-24-501.

44.   Midland Funding's license with the Arkansas State Board of Collection Agencies means it meets at least one of the three prongs of the term "collection agency."

### *Midland Credit Management, Inc.*

45.   Midland Credit Management, Inc., (Midland Credit Management) is a foreign for profit corporation operating from 2365 Northside Drive, Suite 300, San Diego, California 92108.

46.   Midland Credit Management is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6) and Ark. Code Ann. § 17-24-502(5)(A).

47.   Midland Credit Management uses instrumentalities of interstate commerce or the mails in its business the principal purpose of which is the collection of debts.

48.   Midland Credit Management regularly collects or attempts to collect, directly or indirectly debts owed or due or asserted to be owed or due another, specifically Midland Funding.

49.   Upon information and belief, almost all of Midland Credit Management's resources are devoted to debt collection.

50.   Upon information and belief, almost all of Midland Credit Management's revenue is derived from debt collection.

51.   Upon information and belief, almost all of Midland Credit Management's expenses are related to debt collection.

52.   Midland Credit Management is a licensed "collection agency" with the Arkansas State Board of Collection Agencies.

### Factual Allegations

53.   Within one year immediately preceding the filing of this pleading, Defendants attempted to collect from Hampton financial obligations that were primarily for personal, family or household purposes, and is therefore a "debt" as that term is defined by 15 U.S.C. § 1692a(5) and Ark. Code Ann. § 17-24-502(5)(A), specifically a Lane Bryant branded credit card issued by Comenity Bank (the Comenity Account) and a Wal-Mart branded credit card issued by Synchrony Bank (the Synchrony Account).

54.   Hampton applied for and received a Lane Bryant credit card issued by Comenity Bank. Lane Bryant is a retail clothing store.

55.   Hampton applied for and received a Wal-Mart credit card issued by Synchrony Bank.

56.   Hampton used the Comenity Account to purchase clothing for his family.

57.   Hampton defaulted on his Comenity Account.

58.   Hampton used the Synchrony Account to purchase household items and groceries at Wal-Mart.

59.   Hampton defaulted on his Synchrony Account.

60.   Midland Funding purchased portfolios of defaulted Comenity Bank and Synchrony accounts that purportedly included Hampton's defaulted credit accounts.

61.   Synchrony Bank reported to Hampton that it sold his Synchrony Account to Midland Credit Management and that the account balance at the time of sale was $770.17.

62.   On April 20, 2018, Midland Credit Management and Midland Funding reported to Equifax and TransUnion that the balance and amount past due on the Synchrony Bank account was $850.00, and the $850.00 amount appeared on his Equifax and Trans Union credit report. The reporting that the balance and amount past due on the Synchrony Bank account was $850.00 was false.

63.   At the time Comenity Bank sold the Comenity Account to Hamption, it reported the balance as $526.00.

10

64.   On April 20, 2018, Midland Credit Management and Midland Funding reported to Equifax and TransUnion that the balance and amount past due on the Comenity Bank account was $595.00, and the $595.00 amount appeared on his Equifax and Trans Union credit report. The reporting that the balance and amount past due on the Comenity Bank account was $595.00 was false.

65.   Midland Funding purchased portfolios of defaulted Comenity Bank and Synchrony accounts that purportedly included Hampton's defaulted credit accounts.

66.   Midland Credit Management retained Love, Beal & Nixon to collect Hampton's defaulted Comenity Account and Synchrony Account that Midland Funding had purchased.

67.   Midland Funding filed a civil action against Hampton in the District Court of Pulaski County, Arkansas – Sherwood Division.

68.   The debt-collection complaint's signature block included and Love, Beal & Nixon's mailing address, fax, and email address.

69.   Hampton was served with the debt collection complaint and summons.

70.   Hampton retained counsel to represent him in the debt collection litigation.

71.   Hampton became contractually obligated to pay and did pay his counsel attorney's fees to represent him in the debt collection litigation.

72.   May 24, 2018, Hampton served his Answer to the debt-collection complaint on Love, Beal & Nixon by fax, email and US Mail.

73.   On May 24, 2018, Defendants knew that Hampton was represented by counsel.

74.   Communications sent via facsimile are assumed to have been received by the intended recipient if the facsimile confirmation indicates a successful transmission.

75.   On August 3, 2018, Defendants served Hampton with a document entitled "**PLAINTIFF'S AFFIDAVIT IN SUPPORT OF JUDGMENT**" by US Mail at his home in North Little Rock.[6]

76.   Hampton believed that a judgment might have already been entered against him in the case he had retained counsel to defend and was worried that he had lost the debt-collection case without a trial.

77.   Defendants did not serve the **PLAINTIFF'S AFFIDAVIT IN SUPPORT OF JUDGMENT** on Hampton's retained counsel.

78.   Defendants' attempt to collect this debt by having the Affidavit served on Hampton after he had retained counsel and not serving Hampton's counsel with filings was a false and deceptive attempt to collect a debt in violation of numerous provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692c(a)(2), 1692d, 1692e, 1692e(10), and 1692f,

---

[6] *See* Exhibit 2.

amongst others, and the AFDCPA, Ark. Code Ann. §§ 17-24-504(a)(2), 17-24-505(a), 17-24-506(a), 17-24-506(b)(10), and 507(a).

79.   Midland Funding and Midland Credit Management's reporting of false balances and amounts owed on the Comenity Account and the Synchrony Account violates the FDCPA, 15 U.S.C. §§ 1692e and 1692e(8) and the AFDCPA, Ark. Code Ann. §§ 17-24-506(a) and 17-24-506(b)(8).

80.   All of the communications as alleged herein by these Defendants and the employees and agents of Defendants, respectively, constitute false and deceptive collection communications made in violation of numerous and multiple provisions of the FDCPA and the AFDCPA including but not limited to all of the provisions cited herein, amongst others.

### *Summary*

81.   Defendants' communications with Hampton after they knew he was represented by his attorney, was an unfair and deceptive attempt to collect this debt, which materially mislead Hampton as to his rights under the FDCPA and the AFDCPA, and which affected and frustrated Hampton's ability to intelligently respond to Defendants' collection efforts.

82.   All of the communications as alleged herein by these Defendants and the employees and agents of Defendants, respectively, constitute false and deceptive collection communications made in violation of numerous and multiple provisions of the FDCPA and the AFDCPA including but not limited to all of the provisions cited herein, amongst others.

### Standing

83.   Hampton has standing under Article III of the United States Constitution because he has suffered an injury in fact, the injury in fact is traceable to the challenged conduct of Defendants described herein, and her injury in fact is likely to be redressed by a favorable judicial decision in this Court.

84.   Hampton's injury in fact is both particular and concrete because she suffered an invasion of a legally protected interest that is concrete, particularized and actual or imminent.

85.   Hampton has incurred and paid attorney's fees and costs to defend the debt-collection litigation that was frustrated by Defendants' contacts with his instead of his attorney.

86.   Many provisions of the FDCPA, the AFDCPA, and Arkansas's common law recognize a consumer's rights to and to redress for violations of those rights, including the right hire an attorney and have all communication from the debt collector regarding the debt directed to his attorney, under 15 U.S.C. § 1692c(a)(2) and Ark. Code Ann. § 17-24-504(a)(2).

87.   These sections of the FDCPA and AFDCPA recognize a consumer's right to retain and be represented by counsel, protect the consumer's relationship with her attorney, and protects her attorney's authority to effectively represent the consumer by requiring the debt

collector to communicate only with the attorney once the debt collector is informed of the attorney's retention.

88.    The rights under the FDCPA and the AFDCPA to have all communication from debt collectors to a consumer's attorney are not merely procedural because they affirmatively prohibit debt collectors from contacting represented consumers.

89.    Breaches of the rights under the FDCPA and the AFDCPA to have all communication from debt collectors directed to a consumer's attorney causes harm to consumers, in this Hampton, as contacts in violation of these rights harms consumers by interfering with the client-attorney relationship and undermining the consumer attorney's authority as the consumer's representative.

90.    Hampton has incurred and paid attorney's fees and costs to defend the debt-collection litigation that was frustrated by Defendants' contacts with him instead of his attorney.

91.    Hampton also has standing because Midland Funding and Midland Credit Management reported overinflated amounts of his debts to TransUnion and Equifax.

## Causes of Action

### *Count I – Violations of the FDCPA, 15 U.S.C. 1692, et seq.*

92.    Hampton incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

93.   The foregoing acts and omissions of Defendants and their agents constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692, *et seq*, with respect to Hampton.

94.   As a result of Defendants' violations of the FDCPA, Hampton is entitled to actual damages under 15 U.S.C. § 1692k(a)(1); statutory damages in an amount up to $1,000.00 under 15 U.S.C. § 1692k(a)(2)(A); and, reasonable attorney's fees and costs under 15 U.S.C. § 1692k(a)(3), from Defendants herein.

*Count II – Violations of the AFDCPA, Ark. Code Ann. § 17-24-501, et seq.*

95.   Hampton incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

96.   The foregoing acts and omissions of Defendants and their agents constitute numerous and multiple violations of the AFDCPA, Ark. Code Ann. 17-24-501, *et seq.*, with respect to Hampton.

97.   As a result of Defendants' violations of the AFDCPA, Hampton is entitled to actual damages under Ark. Code Ann. § 17-24-512(a)(1); statutory damages in an amount up to $1,000.00 under Ark. Code Ann. § 17-24-512(a)(2)(A); and, reasonable attorney's fees and costs under Ark. Code Ann. § 17-24-512(a)(3)(A), from Defendants herein.

## Jury Demand

98.   Hampton demands a trial by jury.[7]

## Prayer for Relief

99.   Plaintiff Tyshun Hampton prays a judgment be entered against

Defendants as follows:

   a.   for an award of actual damages under 15 U.S.C. §

   1692k(a)(1), and Ark. Code Ann. § 17-24-512(a)(1), against

   Defendants and for Hampton;

   b.   for an award of statutory damages of $1,000.00, under to 15

   U.S.C. § 1692k(a)(2)(A) against each Defendant and for

   Hampton;

   c.   for an award of statutory damages of $1,000.00, under Ark.

   Code Ann. § 17-24-512(a)(2)(A), against each Defendant and

   for Hampton;

   d.   for an award of costs of litigation and a reasonable attorneys'

   fees under 15 U.S.C. 1692k(a)(3), and Ark. Code Ann. § 17-

   24-512(a)(3)(A) against Defendants; and

   e.   for such other and further relief as may be just and proper.

Respectfully submitted,

By: _____

Corey D. McGaha

Ark. Bar No. 2003047

William T. Crowder

---

[7] U.S. Const. amend. 7. and Fed. R. Civ. P. 38.

Ark. Bar. No. 2003138
CROWDER McGAHA, LLP
5507 Ranch Drive, Suite 202
Little Rock, AR 72223
Phone: (501) 205-4026
Fax: (501) 367-8208
cmcgaha@crowdermcgaha.com
wcrowder@crowdermcgaha.com

## Verification

State of Arkansas          )
County of Pulaski          )

Under 28 U.S.C. § 1746, Plaintiff Tyshun Hampton, having first been duly sworn and upon oath, verifies, certifies, and declares as follows:

1.     I am one of the Plaintiffs in this civil proceeding.

2.     I have read the foregoing Complaint prepared by my attorneys.

3.     I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.

4.     I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.

5.     I believe that this civil Complaint is not interposed for any improper purpose, such as to harass any named Defendant, cause unnecessary delay to any Defendant.

6.     I have filed this civil Complaint in good faith and solely for the purposes set forth in it.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 4/4/19

Tyshun Hampton